1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - -    X

CHUFEN CHEN, et al.,            :
                                        17-CV-3808(CBA)
          Plaintiffs,          :

          -against-            :        United States Courthouse
                                        Brooklyn, New York
DUNKIN' BRANDS, INC.,          :
                                        April 17, 2018
          Defendant.           :        3:00 o'clock p.m.

- - - - - - - - - - - - -    X


TRANSCRIPT OF ORAL ARGUMENT
BEFORE THE HONORABLE CAROL B. AMON
UNITED STATES DISTRICT JUDGE.


APPEARANCES:


For the Plaintiffs:          TROY & ASSOCIATES, PLLC
                             41-25 Kissena Blvd., Suite 119
                             Flushing, New York 11355

                             BY: JOHN TROY, ESQ.


For the Defendant:           ARNOLD & PORTER KAYE SCHOLER LLP
                             250 West 55th Street
                             New York, New York 10019

                             BY: KYLE D. GOOCH, ESQ.
                                 SEAN O'LEARY MORRIS, ESQ.


Court Reporter:              Charleane M. Heading
                             225 Cadman Plaza East
                             Brooklyn, New York
                             (718) 613-2643

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

2

1          THE CLERK:  17-CV-3808, Chen against Dunkin' Brands,

2     Inc. on for oral argument.

3          THE COURT:  All right.  Would the parties state

4     their appearances, please, first for plaintiff.

5          MR. TROY:  Good afternoon, Your Honor.  John Troy

6     for plaintiffs.

7          THE COURT:  Good afternoon.

8          MR. GOOCH:  Good afternoon, Your Honor.  Kyle Gooch,

9     Arnold & Porter, for the defendant and here with me is Sean

10     Morris.

11          THE COURT:  Good afternoon.  You all can be seated.

12          Mr. Gooch, are you going to argue the motion?

13          MR. GOOCH:  Yes, Your Honor.

14          THE COURT:  Do you want to be heard?

15          MR. GOOCH:  Thank you, Your Honor.

16          Your Honor, plaintiffs have made three attempts now

17     to state a viable claim against Dunkin' in this matter and

18     they have failed to do so, so we respectfully move that the

19     case be dismissed.

20          I'll first address the personal jurisdiction issue

21     and then I'll move on to the sufficiency of the substantive

22     allegations in the complaint.

23          Now, on personal jurisdiction, the first issue being

24     general jurisdiction, Dunkin' is a Delaware corporation with

25     its principal place of business in Massachusetts.  So it fits

3

1   neither the standard bases for general jurisdiction.

2         Plaintiffs claim that this is an exceptional case

3   because Dunkin' has registered to do business in New York

4   under the New York business registration statutes.  Now, every

5   Court that has considered this issue in the last couple of

6   years has held that is not sufficient to establish general

7   jurisdiction and the cases, plaintiffs rely on some cases from

8   several decades ago and, frankly, they trace back to a case

9   about 100 years ago that held otherwise and --

10         THE COURT:  Cases long before Daimler then?

11         MR. GOOCH:  Right.  And, in fact, they're not only

12   before Daimler and before Goodyear, but they're before

13   International Shoe, and these cases were decided under the

14   Pennoyer v. Neff-era of personal jurisdiction.

15         THE COURT:  That's what they were talking about when

16   I was in law school.

17         MR. GOOCH:  Right.

18         THE COURT:  So that's how old that is.

19         MR. GOOCH:  Old civil procedure here.

20         So we've got a territorial approach under that era

21   of case law where courts held that the states were limited in

22   power to only obtaining jurisdiction over things that were

23   physically present within the state.  And so for a

24   corporation, that presents some issues because the theory at

25   the time is that a corporation is only present in the state in

4

1   which it was incorporated.  This resulted in these business

2   registration statutes where a corporation designates a

3   Secretary of State or some other state official to accept

4   service of process.

5           New, that was the, that was the law under which the

6   business registration as consent for personal jurisdiction

7   first came up.  Then, of course, International Shoe started

8   what was a several decades long transformation in personal

9   jurisdiction law that's recently culminated with Daimler and

10  Goodyear.  And in 2016, the Second Circuit considered this

11  issue in the context of Connecticut's similar statute in the

12  Brown v. Lockheed Martin decision and they determined that

13  these old cases really can't be squared with modern personal

14  jurisdiction.

15          Frankly, it would establish a broad exception -- it

16  would no longer be an exceptional case, to use the terms from

17  Daimler and Goodyear, for a corporation to be subject to

18  general jurisdiction outside of its home state.  It would

19  really be an exception that swallows the rule.  So a

20  corporation like Dunkin' or many other corporations, frankly,

21  which do business all around the country would now be subject

22  to general jurisdiction in any state in which they do a

23  substantial amount of business.  That's directly contrary to

24  what the Supreme Court was envisioning in Daimler when it's

25  drawing the distinction between general jurisdiction and

5

1   case-specific jurisdiction.  And that's why --

2           THE COURT:  So this case could be brought in

3   Massachusetts?

4           MR. GOOCH:  Yes, Your Honor.  It could be brought in

5   Massachusetts, it could possibly be brought in Delaware where

6   Dunkin' is incorporated, but the nonresident plaintiffs cannot

7   adjudicate their claims in New York because, then moving on to

8   specific jurisdiction, their clients have no nexus to

9   New York.

10          So, we're not challenging specific jurisdiction as

11  to the one New York resident plaintiff, but for everybody

12  else, the Supreme Court's recent decision in Bristol-Myers

13  Squibb --

14          THE COURT:  So you agree that there is specific

15  jurisdiction for Chen's case here in New York?

16          MR. GOOCH:  Yes, Your Honor.  We do not challenge

17  that because there is a factual nexus there.  She brought, she

18  bought her product and allegedly suffered her injury in the

19  state of New York.  But plaintiffs don't even allege any such

20  nexus, any such connection to New York for the nonresident

21  plaintiffs.

22          THE COURT:  So in a case like this, to make a case

23  for jurisdiction, you would have to limit it to everybody in

24  New York who bought the sandwich?

25          MR. GOOCH:  Yes, Your Honor.  I think in the wake of

6

1  <u>Daimler</u> and <u>BMS</u>, courts are recognizing that, in effect, in a

2  case where there's no general jurisdiction over the defendant,

3  you're really limited to statewide claims so that you can't

4  have nonresidents come in and have the courts of New York

5  adjudicate their claims for which there's no connection.

6          THE COURT:  And their claims are also under the

7  various provisions of their state's law, correct?

8          MR. GOOCH:  Correct.

9          THE COURT:  All right.  Why don't you go on to your

10  substantive argument about why there's no claim under the --

11  well, I guess your substantive argument is under the

12  Magnuson-Moss Act, there is no federal claim.

13          MR. GOOCH:  Yes, Your Honor.  There's no federal

14  claim under --

15          THE COURT:  Because there's no written warranty or

16  time frame?

17          MR. GOOCH:  Yes, Your Honor.  Under the Act, a

18  warranty is very narrowly defined.  It has to be an

19  affirmation or promise that the product is either free from

20  defect or would need a specified level of performance.  As we

21  explained in our brief and as the cases demonstrate, this is a

22  deliberate choice to narrowly construe those because

23  otherwise, virtually any complaint that anybody has about a

24  product, a food or a beverage product, turns into a federal

25  warranty claim and that's not what the drafters had in mind.

7

1           So this case is a lot like the <u>Frito-Lay</u> case that

2    we cite in this District where the product description is all

3    natural.  So the court there said that, well, that's just a

4    mere product description, it's not a warranty or a promise to

5    be free from defect and it's not a promise to meet a specified

6    level of performance.  That's really the allegation here,

7    being Angus steak, again, not a promise of the product being

8    free from defect.  It's not a performance promise.

9           And so that really leaves --

10           THE COURT:  Does there have to be a specified time

11   period to which a disclosure relates or not?

12           MR. GOOCH:  Well, yes.  For that subsection two,

13   there has to be not only a specified performance level but

14   also a specified time period, neither of which is present

15   here.

16           THE COURT:  Okay.

17           MR. GOOCH:  And so that leaves Plaintiff Chen's two

18   claims under the general business law:  Consumer fraud and

19   false advertising.

20           That claim, those claims fail for two different

21   reasons.  The first is that they fail to plead a plausible

22   theory of deceptive conduct.  Under GDL349 and 350, it's not

23   sufficient that a particular individual was misled or

24   deceived.  They have to plead and eventually prove that the,

25   that the ad was deceptive to a reasonable consumer when it's

8

1    viewed in its full context.

2          That's the standard that the Second Circuit

3    discussed in the <u>Fink</u> case cited in our brief.  The Second

4    Circuit also said that it's well settled that a court at a

5    motion to dismiss stage on the pleadings can determine as

6    matter of law whether a particular advertisement could be

7    deceptive to a reasonable consumer.

8          THE COURT:  And that's because the videos of the

9    ads, I can consider those?

10         MR. GOOCH:  Yes, Your Honor, and that's what the

11   Second Circuit really looked to in <u>Fink</u>.  They -- and, in

12   fact, initially in that case, the ads themselves were not in

13   the record and they asked the parties to supplement the record

14   because the Second Circuit recognized really you've got to

15   look at the ads themselves and that's evidence, to look at the

16   ads themselves and see if they're misleading.  In this case,

17   there's television commercials that are described in great

18   detail in the complaint, screen shots and recitation of the

19   text.

20         What the plaintiffs are complaining about is the

21   term "Angus steak" and they have a theory of deception where a

22   reasonable consumer, according to them, would view the term

23   "Angus steak" as exclusively referring to an intact cut of

24   beef.  They go even further and they say you can't even add

25   what they would call binders, water or added fat.

9

1          So, essentially the plaintiffs in this case are

2     taking issue with Dunkin's recipe.  This case is about whether

3     a steak served in a restaurant setting could be chopped up,

4     grounded or marinated.  They claim it could never be because

5     it would always being misleading and we claim that that -- and

6     we believe that that's just not consistent.

7          First, with the definition of "steak," if you look

8     at the common definition of "steak," I think we cited three or

9     four different definitions in our brief.  One of the

10    definitions of "steak" is from a -- is for a grounded beef

11    product that's formed into a pattie.  That's what we have

12    here.  In fact, the ingredient statement which is available to

13    consumers, it's, again, referenced in their complaint, found

14    on Dunkin's website, describes the product as being a

15    beefsteak pattie with, consisting of two different things:

16    Angus beef and a marinade.  The marinade itself has a number

17    of ingredients.

18          THE COURT:  Where would you find that description of

19    the ingredients?

20          MR. GOOCH:  So, in the record, it's at Exhibit 2 to

21    my declaration.

22          THE COURT:  But where would the consumer see that?

23          MR. GOOCH:  So the ingredient statement is available

24    on the website.  It's also available in the store upon

25    request.  So you had, in the "Australian For Beer" case, the

10

1    <u>MillerCoors</u> case cited in our briefs, one of the things the

2    court looked to there was the disclosure on the defendant's

3    website that the beer was actually brewed in the United States

4    because the claim was that it was misleading as to where the,

5    whether the beer was brewed in Australia or the United States.

6              THE COURT:  Because it was called Australian beer?

7              MR. GOOCH:  Yes, "Foster's Australian for Beer."

8    And so one of the things the court looked to there, and,

9    again, dismissing it on the pleadings, was the fact that the

10   place of the brewing was disclosed on the defendant's website.

11             THE COURT:  And the ingredients are disclosed on the

12   website here?

13             MR. GOOCH:  Yes, Your Honor.  And that's shown in

14   Exhibit 2 to my declarations, the ingredient statement you can

15   pull from the website that shows that it's a beefsteak pattie.

16   This is something that's disclosed in the ingredient

17   statement, a pattie obviously being, you know, something

18   that's formed from ground beef rather than a single intact

19   slice which would not be called a pattie.

20             So not only do you have the ingredient statement and

21   just the common definition of "steak," but you also have these

22   ubiquitous images throughout the advertising, frankly

23   throughout the stores themselves that one can see what the

24   product is and that it's not a single intact piece of beef.

25             Again, we're looking here at what, what would a

1    reasonable consumer understand this to be going into a store,

2    going into a Dunkin' Donuts franchise location.  And you know,

3    we submit that a reasonable consumer would not expect simply

4    an intact piece of beef with no marinade, with no added

5    ingredients.  You know, that would be something that would not

6    be, frankly, consistent with what the product is which is a

7    breakfast sandwich that you grab and maybe eat on the go with

8    maybe one hand.  It's not something you sit down with a fork

9    and knife and eat.

10              THE COURT:  A choking hazard, you mean?

11              MR. GOOCH:  Right.  So, basically, our point is that

12   we can -- it is made with Angus steak, Angus steak is one of

13   the imports into this product and we're entitled to call it an

14   Angus steak sandwich.  You know, we have the latitude to do

15   that and it's not misleading to a reasonable consumer.

16              THE COURT:  Are there any regulations that governing

17   what you have to say or what you can say with regard to the

18   composition of the product.

19              MR. GOOCH:  So, the, there are no regulations that,

20   the USDA has something called standards of identity for

21   certain products.  There's no standard of identity for Angus

22   steak or the title "steak."

23              The plaintiffs have cited to some USDA regulations

24   but they relate to products, products sold in a supermarket.

25   So that's -- I'm going into the supermarket and I might see

1  ground beef or steak there and those regulations are saying

2  essentially that you can't add a bunch of water or fillers to

3  those products and sell them because they are sold by the

4  pound and that would be misleading.

5          Those regulations don't apply to cooked items in

6  restaurants, sold by restaurants.  They apply to raw products

7  sold in grocery stores and so they're really inapplicable here

8  and the plaintiffs have not cited any regulation that would

9  apply.

10          THE COURT:  Okay.  Thank you, Counsel.

11          MR. GOOCH:  Thank you.

12          THE COURT:  Mr. Troy?

13          MR. TROY:  Yes, Your Honor.

14          THE COURT:  Why don't you take up the last point

15  first.

16          MR. TROY:  Yes.

17          THE COURT:  Unless I'm confusing you.

18          MR. TROY:  Your Honor, because --

19          THE COURT:  Do you dispute the fact that the

20  ingredients list Angus steak and that Angus steak is an

21  ingredient?  Do you have any basis to dispute that?

22          MR. TROY:  Yes, Your Honor.  I believe the name is

23  deceptive.  Why?  Because it's --

24          THE COURT:  No.  I asked you a different question.

25          MR. TROY:  Yes.

13

1          THE COURT:  The question that I asked you -- Counsel

2     says that their list of ingredients lists as one of the

3     ingredients Angus steak.  My question is do you dispute that

4     in any way, that Angus steak is a part of what is in that

5     sandwich?

6          MR. TROY:  Yes, Your Honor, I dispute it -- oh, no,

7     it's on the advertisement, but it's maybe Angus beef but it's

8     not a steak.  The reason why is we think that one is deceptive

9     itself is because, let's put it this way, Angus steak -- if

10    it's not Angus, is that deceptive?  Yes.  If it's Angus steak,

11    it's not a steak for reasonable person.

12         THE COURT:  No, but look at the ads.  You see the

13    ads.  They're on television.  They show you the sandwich.

14    It's clear it's not an intact piece of meat.

15         MR. TROY:  Your Honor, it's just for one second,

16    maybe one second, nobody really watching the TV.  Sometimes we

17    are typing --

18         THE COURT:  Well, isn't that the ad that you're,

19    isn't that the basis for your claim, that it is deceptive,

20    these ads?

21         MR. TROY:  Your Honor --

22         THE COURT:  It is the ads that you're claiming are

23    deceptive, correct?

24         MR. TROY:  Yes, Your Honor, but --

25         THE COURT:  Well, if the ads are deceptive, it is to

14

1   a reasonable person watching the ad, it is not to somebody who

2   is on their computing looking at the ad, correct?

3          MR. TROY:  Correct, but, Your Honor, whoever, they

4   are consumer.  They are not, you know, they are very, they

5   watch the TV, they just go to the Dunkin' Donuts store.  And I

6   challenge the defense counsel, he said they --

7          THE COURT:  How much do these sandwiches cost?  What

8   does the sandwich cost?

9          MR. TROY:  $3.84.

10         THE COURT:  $3.84?

11         MR. TROY:  Yes.

12         THE COURT:  So there's an ad which shows for this

13  sandwich, it shows, if you look at the ad, that it's a pattie,

14  it's not a piece of steak.  So if someone watches the add

15  which you are contending is the deceptive ad, they will see

16  that it is a pattie and then they are paying $3.84 for

17  something.  It would be difficult, unreasonable to believe

18  that they are getting a piece, an intact piece of Angus steak

19  for $3.84.

20         MR. TROY:  Your Honor, McDonald's even have steak,

21  egg and cheese, but they really have the steak in, on, intact

22  piece of the meat and then they only sell less than $4 too.

23         You know, when my two children, they are in the

24  school on the Sunday morning, we always eat those kind of

25  steak, egg and cheese in McDonald's store.  So we know, you

15

1   know, regular reasonable person, when you, you know, it's easy

2   to distinguish.  It's a steak or it's a pattie.  A reasonable

3   person should have, you know, they are -- so we're talking

4   about the name is deceptive.

5        Let's talking about Angus.  If -- we did not

6   challenge but maybe some day, right?  If it's the beef, it's

7   not Angus beef, it's not deceptive?  I believe yes.  And if

8   it's a steak, you talking about Angus steak, but if it's not a

9   steak, it's a meat pattie, it's a beef meat pattie.  Let's put

10  it this way.  The business, when they are designed, their

11  products name, they're smart.  They just try to give the image

12  nation of the product, right?  Why you have Angus steak, beef,

13  beef pattie, and you choose only Angus beef, Angus steak.  And

14  just now I believe the defense counsel talking about, you

15  know, layers.  I don't think that they have ingredient in the

16  Dunkin' Donuts store.  They only have a small picture like

17  this one.

18       THE COURT:  The picture in the store, you can see

19  it's a pattie, correct?

20       MR. TROY:  No.  No.

21       THE COURT:  Do you have the picture in the store in

22  your complaint or your papers?

23       MR. TROY:  No.  Your Honor, we can supplement those

24  kind of stuff.  The reason why, you know, if you take the

25  picture and then put it in front of you, I believe maybe you

16

1    can see it, but if it's on the wall far away from you, a

2    reasonable consumer is not going to distinguish it's a meat

3    pattie or it's a steak.  And that's talking about this one.

4    Even in the restaurant, you have binders, you have some eggs,

5    but they come from -- they put on the steak itself.  We are

6    talking about the meat pattie.  It's a ground beef and you add

7    a lot of stuff in and you combine them together, you put them

8    in together.

9           THE COURT:  Well, you do not dispute that this

10    pattie contains Angus steak.  You are not disputing that.  Is

11    there some regulation that requires that in order to use the

12    term "Angus steak," you need a certain percentage of the

13    product to be Angus steak?

14           Is there some requirement that requires that, either

15    under the consumer laws or FDA regulation, anything that

16    requires that in order to use the name, it has to be some

17    percentage of the product?

18           MR. TROY:  Your Honor, as I know, let's put it this

19    way.  If a tuna can --

20           THE COURT:  Can you answer my question?  Is there a

21    regulation that requires it?

22           MR. TROY:  Yes, I believe so.

23           THE COURT:  What regulation is it?

24           MR. TROY:  I believe it's contain 80 percent or

25    something, you can call, it's a beef, but you cannot call

17

1  that's a steak.

2          THE COURT:  What regulation is that and where is it

3  in your papers?

4          MR. TROY:  I believe the labeling, the packaging and

5  labeling.

6          THE COURT:  Counsel says that that's for products in

7  the store that are not products made in a restaurant.

8          MR. TROY:  Your Honor, I don't think that one is

9  applicable to here.  If it's applicable to here, I believe

10 they -- on their package, I don't think they discuss anything

11 relating it to the pattie, to the beef, to the steak at all.

12 And that's why when you go to the -- everybody, when you go to

13 the Dunkin' Donuts.

14         THE COURT:  So you don't have a regulation that

15 requires, you haven't pointed me to any regulation that

16 requires that they have a certain percentage of the product

17 needs something before you can call it something.

18         MR. TROY:  Your Honor, I believe I can supplement in

19 two days.

20         THE COURT:  Supplement what?

21         MR. TROY:  To give you some judicial stuff talking

22 about those kind of stuff, those kind of percentage.

23         My understanding is if you have a tuna can, but if

24 the tuna can contain more than 20 percent of non-tuna, you've

25 got to disclose it on packaging, but this is not a packet of

18

1    food.

2         THE COURT:  Yes.  That's different.  This isn't is a

3    packaging food.  That wouldn't apply.

4         MR. TROY:  Yes.

5         THE COURT:  Why don't you address counsel's standing

6    arguments?

7         MR. TROY:  Okay.  Your Honor, regarding to the

8    general jurisdiction in New York.

9         THE COURT:  Right.

10        MR. TROY:  I believe the New York, when the Court of

11   Appeals, the ruling on the Connecticut case, I believe they're

12   talking about New York State law is totally different from

13   Connecticut, and some judge even mentioned if the case

14   happened in New York State, it should be different.

15        THE COURT:  Which case are you referring to?

16        MR. TROY:  I'm talking about I believe that's Brown.

17   So I don't think that we can apply the Connecticut case, I

18   believe that Brown, 814 F3d 618, because I believe to do

19   business or authority to do business is according to each

20   state's law and the, you know, interpleader by the state

21   court.  So that's why, you know.

22        THE COURT:  So what's different about the New York

23   statute?  How does it differ from the Connecticut statute?

24        MR. TROY:  New York?  Your Honor, I believe on our

25   opposition brief, on page, I believe it should be page, the

19

1  end of page one, the contents, the page one and in the

2  beginning of page two.

3       They're talking about in New York, if you want to

4  do -- you get a authorization to do the business, you consent

5  to the jurisdiction of New York State.  That's the one, second

6  one, you've got to authorize the process server person and

7  there should be a location to serve.  I believe that's totally

8  different from the Connecticut law.  I believe that's one.

9  And the second one, that's talking about specific jurisdiction

10 over the Dunkin' Donuts relating it to the nonresident.

11      THE COURT:  Yes, we agree there is no dispute about

12 Chen.

13      MR. TROY:  I know, but that's talking about

14 nonresident plaintiffs at this moment.

15      THE COURT:  Yes.

16      MR. TROY:  I believe Dunkin' Donuts is a franchise

17 and they enforce strict uniform standard policy on everything.

18 They even have consultant to enforce laws, strict uniform

19 standard and policy.  If that's the case, I believe that, you

20 know -- New York, that's the case.  You know, the party, I

21 believe it's settled when, from the franchisee and franchisor

22 have this type of management or contract, I believe that they

23 give the specific jurisdiction.  So we think --

24      THE COURT:  How do the franchise contracts in other

25 parts of the country have anything to do with New York?

20

1          MR. TROY:  Because the franchisor enforce the

2     uniform policy and standards and if that's the case, that

3     means I believe they have common ground of almost exactly the

4     same stuff.

5          THE COURT:  Do you have any other arguments you want

6     to address?

7          MR. TROY:  Yes, Your Honor.

8          And regarding to the claim, we think the product's

9     name is deceptive to the reasonable consumer we mentioned, but

10    regarding to the -- we think, we deem adequate recognizable

11    injury because every consumer --

12         THE COURT:  She paid for it, that's the injury?

13         MR. TROY:  Yes.  They paid interest or the premium

14    price for the so-called steak, for the so-called Angus and

15    steak.

16         THE COURT:  When Ms. Chen got the sandwich and took

17    a bite out of it, did she try to take it back or ask for her

18    money back?

19         MR. TROY:  I believe sometimes you just take it out.

20    You don't get a chance to go back always.

21         THE COURT:  What were her circumstances, do you

22    know?

23         MR. TROY:  You know, I believe she bought it and

24    then she eat it at home or somewhere when she maybe take a

25    lunch break or something.

21

1            And regarding to the Magnuson case, I believe the

2     name --

3            THE COURT:  Is a warranty?

4            MR. TROY:  Yes, it's a warranty.  Warranty it's

5     Angus.  Warranty it's a steak.  Every reasonable person is

6     going to think of it that way.

7            Okay.  And regarding to the injunction relief --

8            THE COURT:  Yes.

9            MR. TROY:  We think --

10           THE COURT:  What's the injunctive relief?  They know

11    now that it's wrong, that the advertising is wrong.

12           MR. TROY:  And they still doing it.

13           THE COURT:  Well, I get that but I mean it is the

14    injury to the people.  Injunctive relief is not going to give

15    them any solace.  They don't say that they continued to be

16    deceived and nobody intends to purchase the products in the

17    future.  None of the plaintiffs do.  They all say, okay, we

18    were deceived.  So why is there a request for injunctive

19    relief?

20           MR. TROY:  Because the reasonable person would get,

21    receive --

22           THE COURT:  We're talking about the plaintiffs.

23           MR. TROY:  Yes, Your Honor.

24           THE COURT:  They are no longer going to be deceived.

25    They took one bite out of that sandwich and they realize

22

1   they've been received, but now they are no going to no longer

2   be deceived.  They know now that this isn't an intact piece of

3   steak.  So why are they entitled to injunctive relief?

4           MR. TROY:  Your Honor, I believe for this case, it's

5   a class action case.

6           THE COURT:  But everybody in the case has already

7   bought the sandwich and everybody's been deceived, right?

8   That is your class, right?

9           Isn't your class the people who bought the sandwich

10  and are deceived?  They're not people have who haven't yet

11  bought the sandwich, are they?

12          MR. TROY:  Your Honor, I --

13          THE COURT:  How do you define your class?

14          Where's your complaint?

15          MR. TROY:  Your Honor, we may have a person in the

16  complaint, I believe.  So our position is whoever who are

17  potential member of the class, they may be deceived, so we

18  highly believe the injunction should be stayed and not only

19  for the New York, I believe.

20          THE COURT:  It says your class is defined as all

21  persons in the United States who purchased Angus steak and egg

22  sandwich.  These are the people who purchased it.  So they

23  already know they've been deceived.  That's your class.

24          MR. TROY:  Your Honor, do you think that the class

25  action is going to -- the time of day is going to be that they

23

1  file a complaint or that they, maybe the court grant the class

2  certification?

3         THE COURT:  Well, what does that have to do with

4  anything?

5         MR. TROY:  Because maybe we have more member of the

6  class.  It's going on and on.

7         THE COURT:  Okay.  Anything else you want to

8  address, Counsel?

9         MR. TROY:  Your Honor, not from plaintiff.

10        THE COURT:  Okay.  Thank you.

11        Do you have any brief rebuttal?

12        MR. GOOCH:  No.  Thank you, Your Honor.

13        THE COURT:  Okay.  Thank you both.  I will reserve

14  decision.

15        (Matter concluded.)

16

17

18              *     *     *     *     *

19

20

21  I certify that the foregoing is a correct transcript from the
    record of proceedings in the above-entitled matter.

22

23    /s/ Charleane M. Heading              October 5, 2018
    _____    _____
24       CHARLEANE M. HEADING                    DATE

25

CMH      OCR      RMR      CRR      FCRR